No. 57,732
No. 57,789

STATE OF KANSAS, *Appellee and Cross-Appellant*, v. LOUIS KEELER, JR., *Appellant and Cross-Appellee*.

(710 P.2d 1279)

Opinion filed December 6, 1985.

*Roger L. Falk*, of Matlack & Foote, P.A., of Wichita, argued the cause and was on the brief for appellant.

*Geary Gorup*, assistant district attorney, argued the cause and *Robert T. Stephan*, attorney general, *Clark V. Owens*, district attorney, and *Kimberly Gee Vines*, assistant district attorney, were with him on the brief for appellee and cross-appellant.

The opinion of the court was delivered by

HOLMES, J.: Appeals by both the defendant and the State in a criminal action have been consolidated in this court. Louis Keeler, Jr., appeals his jury conviction of felony theft (K.S.A. 1984 Supp. 21-3701). The case, originally docketed in the Court of Appeals, was transferred to the Supreme Court pursuant to K.S.A. 20-3018(c). The State, in the same case, appeals from the sentencing of the defendant. The appeal of the defendant upon transfer to this court was consolidated with the appeal of the State. We will first address the appeal of the defendant.

Edward and Lesa Sippel awoke at their home in Wichita on the morning of May 2, 1984, to find their 1977 Toyota Celica automobile missing. It had been parked and locked at the Sippel home at approximately 11:15 p.m. the previous evening. Mrs. Sippel testified she had placed her keys, along with her purse, on the couch in their home. The next morning the key ring and purse remained where she had placed them, but the Toyota key was missing. The automobile was found on May 11, 1984, parked at the intersection of 17th Street and Poplar in Wichita, approxi-

mately two to three blocks from where Louis Keeler, Jr., resided. Bill Britten lived in the basement of the Sipple residence and was employed at an Amoco service station. On the night of May 1, 1984, Keeler, an acquaintance of Britten, came into Britten's place of employment and asked for a ride to the apartment of Diana Finley, a friend of Keeler. When Britten got off work shortly after midnight he drove Keeler to the Farmington Square Apartments; however, Miss Finley was not at home. The two then proceeded to Britten's room in the basement of the Sippel home with the idea that Keeler would wait for Miss Finley to get home and then he would return to the Finley apartment. Upon Miss Finley's return home, Britten attempted to secure a taxicab to transport Keeler to the Finley apartment. Keeler was upstairs in the Sippel home for a period of five to ten minutes while Britten was attempting to get a cab for him. Subsequently, Britten wanted to go to bed and Keeler said he would go outside to wait for the cab. Keeler testifed that upon the failure of the taxicab to show up, he decided to walk to the Farmington Square Apartments, a distance of approximately three miles. Miss Finley testified Keeler arrived at her apartment 20 to 25 minutes after he first called her that morning. She also testified she did not see Keeler as he arrived, did not at anytime see him in possession of the Toyota, and drove him home later in the day.

Miss Sherry Alford worked with Britten at the Amoco station and noticed the Sippel Toyota automobile parked near 17th Street and Poplar during the two-day period prior to May 11, 1984. It was not parked in the same place throughout the period, indicating that someone was using the Toyota. She inquired of Britten about the Sippel automobile being parked there and that led to the recovery of the Toyota by Mr. and Mrs. Sippel. Keeler raises several points on appeal.

Appellant's first issue on appeal is that the verdict is not supported by the evidence. K.S.A. 1984 Supp. 21-3701 provides in part:

"Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property:
    (a) Obtaining or exerting unauthorized control over property."

The attack upon the evidence is twofold: first, that there was insufficient evidence to support a finding of an intent to *permanently* deprive the Sippels of the possession, use or benefit of the

Toyota and second, in the alternative, that appellant was so intoxicated he could not form the specific intent to permanently deprive as required by the statute. It is true that the State's case was built solely on circumstantial evidence. There were no witnesses produced who saw Keeler in or near the Toyota during the nine or ten days it was missing. The main defense asserted by Keeler was that he had nothing to do with the disappearance of the Sippel Toyota and knew absolutely nothing about it.

In *State v. Zuniga*, 237 Kan. 788, 703 P.2d 805 (1985), the court stated the scope of review on appeal when a criminal defendant challenges a verdict based on the sufficiency of the evidence:

"In a criminal action, when the defendant challenges the sufficiency of the evidence to support a conviction, the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of the charge are sustained." 237 Kan. 788, Syl. ¶ 5.

The defendant argues that no intent to permanently deprive was demonstrated by the evidence. K.S.A. 21-3110(6)(a) defines "to deprive permanently" as taking from the owner the possession, use or benefit of his or her property, without an intent to restore the same.

Appellant contends that, at best, the evidence only shows the borrowing or taking of the car for the purpose of getting to Miss Finley's home and then across town to go home. The facts adduced at trial, when viewed in the light most favorable to the prosecution, showed that Keeler obtained unauthorized control of the Sippels' Toyota, used it for several days and then abandoned it on the streets of Wichita. There was nothing to indicate the defendant intended to return the automobile at the time it was appropriated. During the several days before it was recovered defendant made no effort to return the automobile, or to alert the Sippels as to its whereabouts. We agree that theft under K.S.A. 1984 Supp. 21-3701 is a specific intent crime; however, such an intent may be, and ordinarily must be, proved by circumstantial evidence. 21 Am. Jur. 2d, Criminal Law § 130. Specific intent as an element of the crime charged is normally a question of fact for the jury and may be shown by acts, circumstances and inferences reasonably deducible therefrom and need not be established by direct proof. *State v. Dubish*, 234 Kan. 708,

Syl. ¶ 8, 675 P.2d 877 (1984). The facts and circumstances amply support the jury's implicit finding of an intent to permanently deprive. *Cf. State v. Warren,* 221 Kan. 10, 557 P.2d 1248 (1976).

In the alternative, Keeler argues that because of his intoxicated state on May 2, 1984, he was incapable of forming the specific intent required by statute. K.S.A. 21-3208(2) provides:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

Where the crime charged requires a specific intent, voluntary intoxication may be a defense and an instruction thereon is required where there is evidence to support that defense. *State v. Sterling,* 235 Kan. 526, Syl. ¶ 2, 680 P.2d 301 (1984). The defendant has the burden of showing that he was so intoxicated that he was robbed of his mental faculties, and whether he was drunk to such extent is a question for the trier of the facts to decide, under proper instructions. 21 Am. Jur. 2d, Criminal Law § 155; *State v. Falke,* 237 Kan. 668, 703 P.2d 1362 (1985).

There was evidence that appellant had been drinking alcoholic beverages on May 1, 1984, and in addition he had some beers while with Britten in the Sippel home. However, there is little, if any, evidence that Keeler was so intoxicated that he could not formulate a specific intent as required by the statute. Britten testified that when he first saw Keeler at the Amoco station about 10:00 p.m., "he looked like he might have had a little bit to drink, but to no excess." When questioned as to Keeler's condition upon his return two hours later, when they left the station, Britten testified that he "[s]eemed to be the same as he was before [at 10:00 p.m.]" and that Keeler's condition had not changed. Keeler, in his testimony in referring to his condition at the time he supposedly left the Sippel residence to walk to Miss Finley's, stated: "I wouldn't say I was drunk, now." The trial court instructed the jury in accordance with PIK Crim. 2d 54.12, which provides:

"Voluntary intoxication is not a defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, intoxication may be taken into consideration in determining whether the accused was capable of forming the necessary intent or state of mind."

The jury heard all the evidence, was properly instructed and its verdict is supported by the evidence.

Next, appellant asserts error in the court's instructions to the jury. He contends that the court improperly instructed on the burden of proof and was in error in failing to instruct on the lesser offense of unlawful deprivation of property. On the burden of proof issue, the court instructed:

"The law places the burden upon the State to prove the defendant is guilty. The law does not require the defendant to prove his or her innocence. Accordingly, you must assume that the defendant is *innocent* unless you are convinced, from all of the evidence, that he is guilty.

"You should evaluate the evidence admitted in this case and determine the *innocence* or guilt of the defendant entirely in accordance with these instructions. The test you must use is this: if you have no reasonable doubt as to any of the claims made by the State, you should find the defendant guilty as charged; or if you have a reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant not guilty." (Emphasis added.)

This instruction was approved in *State v. Laughlin*, 232 Kan. 110, 652 P.2d 690 (1982); and *State v. Mack*, 228 Kan. 83, 612 P.2d 158 (1980); and was taken from PIK Crim. 52.02. It is the appellant's position that, by using the words "innocent" and "innocence," the jury may be misled as to the proper burden of proof. Keeler requested a modified version of PIK Crim. 2d 52.02, which read:

"The law places the burden upon the State to prove the defendant is guilty. The law does not require the defendant to prove he is not guilty. Accordingly, the defendant need not prove anything; and you must assume that the defendant is not guilty unless you are convinced from all of the evidence in the case that he is guilty beyond a reasonable doubt.

"You should evaluate the evidence admitted in this case and determine whether the defendant is guilty or not guilty entirely in accordance with these instructions. The test you must use is this: If you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty. If you have a reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant not guilty."

PIK Crim. 2d 52.02 has retained the use of the words innocent and innocence in its first paragraph but has substituted the words "not guilty" for the word "innocence" in the second paragraph. It is true that the defendant does not have to prove his innocence and that the burden is upon the State to prove a defendant *guilty beyond a reasonable doubt*. Failure to do so requires a jury to find the defendant not guilty under the evidence; it does not require the jury to find the defendant is innocent. In the instant case the confusion between the terms *not guilty* and *innocent* is

compounded by the court's final instruction on the duty of the jury, which included:

"You are instructed that your only consideration in this case is the guilt or innocence of the defendant."

In discussing the use of the word "innocent" in a criminal trial, one authority has stated:

"Whenever the terms *guilty, not guilty,* and *innocent* are used in a criminal trial, it is essential that their specific meanings be defined to, and understood by, the jury. It is also essential that the usage of these terms by the court and counsel during a trial be consistent with the definitions stated. Any incorrect or contradictory language may result in the jury being misled and confused as to its role in the trial.

"In common usage, the word *guilty* is a specific *factual* description of a reality. It describes a person who committed the act or crime. Whether the prosecution can prove that he actually did it is a separate question to be determined at trial. A second meaning of the word *guilty* refers to the subjective conclusion of the jury in the form of a verdict in a criminal trial. This conclusion comes into existence only at the end of the trial, and only if the prosecution has convinced the jury of the *factual* guilt of the defendant beyond a reasonable doubt.

"In common usage, the word *innocent,* as with the word *guilty,* is a specific factual description of a reality. It describes a person who did not commit the act or crime. A person who is *innocent* is defined, in both common and legal usage, as one who is 'free from guilt.' Whether or not he is convicted or acquitted is a separate question to be determined at trial. As in factual guilt, the factual *innocence exists regardless* of the subjective conclusion of the jury. Unlike the word *guilty,* the word *innocent* has no court verdict counterpart in American criminal law. 'Innocent' is not one of the possible verdicts that a jury may return. A defendant who is not proven guilty beyond a reasonable doubt is found to be 'Not Guilty.'

"In ordinary lay usage, the term *not guilty* is often considered to be synonymous with *innocent.* In American criminal jurisprudence, however, they are not totally synonymous. 'Not Guilty' is a legal finding by the jury that the prosecution has not met its burden of proof. A 'Not Guilty' verdict can result from either of two states of mind on the part of the jury: that they believe the defendant is factually innocent and did not commit the crime; or, although they do not necessarily believe he is innocent, and even 'tend' to believe he did commit the crime, the prosecution's case was not sufficiently strong to convince them of his guilt beyond a reasonable doubt.

"Within this second state of mind (reasonable doubt) resulting in a 'Not Guilty' verdict lies the distinction between the terms *not guilty* and *innocent.*

"Since a 'Not Guilty' verdict can be predicated on that 'gray zone' of uncertainty somewhere between a belief in innocence and the required proof of guilt, it would be incorrect to state that a conclusion of 'Not Guilty' means that the jury believes the defendant is innocent. Although a verdict of 'Not Guilty' certainly may be based upon a belief in the defendant's innocence, it just as certainly may

be based on a hesitation in belief of guilty which amounts to a reasonable doubt in the minds of the jury.

"Inasmuch as the terms *not guilty* and *innocent* have for the most part been used interchangeably throughout the years by lay people as well as by the legal profession, instead of the correct term 'Guilty or Not Guilty' being used exclusively, the far more common, but incorrect term 'Guilt or Innocence' has insidiously crept into the American language and consciousness.

"While a defendant's guilt or innocence obviously is the most important *moral* issue at every criminal trial, and could not possibly be more *legally* relevant (since if a jury believes a defendant is innocent they must find him 'Not Guilty'), the issue for the jury to determine is not the defendant's guilt or innocence. It is whether or not the prosecution has met its legal burden of proving guilt beyond a reasonable doubt. If the jury answers in the negative, they must conclude that the defendant is 'Not Guilty,' even in those situations where they tend to believe he did commit the crime." Bugliosi, *Not Guilty and Innocent: The Problem Children of Reasonable Doubt*, Vol. 20, No. 2, Court Review 16 (1983).

The frequent confusion as to the proper terms to be used in instructing the jury is borne out in the instant case by the defendant's requested instructions which used the words "not guilty" rather than "innocent" in the burden of proof instruction and then in requested instruction No. 5 stated:

*"Your only concern in this case is determining the guilt or innocence of the defendant.* The disposition of the case thereafter is a matter for determination by the Court." (Emphasis added.)

The Advisory Committee on Criminal Jury Instructions recognized the problem in part and now PIK. Crim. 2d 52.02 refers to a determination of "whether the defendant is guilty or not guilty" rather than the earlier version which directs the jury to "determine the innocence or guilt of the defendant." A very similar issue was raised in *State v. Maxwell*, 10 Kan. App. 2d 62, 691 P.2d 1316, *rev. denied* 236 Kan. 876 (1984), where the defendant complained of the use of the word "innocence" instead of "not guilty" in the instruction. The court affirmed the trial court's instruction, stating "although the present wording of PIK Crim. 2d 52.02 (1983 Supp.) may be preferred, it still remains that the Kansas Supreme Court has previously approved PIK Crim. 52.02. Accordingly, use of this instruction was not erroneous." 10 Kan. App. 2d at 69.

The questionable use of the term innocent in referring to the State's burden of proof has not been confined to state trial and appellate courts. In the oft-cited case of *Jackson v. Denno*, 378 U.S. 368, 12 L.Ed.2d 908, 84 S.Ct. 1774 (1964), the Supreme Court referred to the "guilt or innocence" of the defendant on

numerous occasions. 378 U.S. at 374, 379, 387, 394. As additional examples, see *Taylor v. Kentucky*, 436 U.S. 478, 485, 56 L.Ed.2d 468, 98 S.Ct. 1930 (1978); *Williams v. Florida*, 399 U.S. 78, 82, 26 L.Ed.2d 446, 90 S.Ct. 1893 (1970).

We conclude that while the proper use of the term "not guilty" rather than the term "innocent" is certainly preferable in a trial court's instruction to the jury, the use of PIK Crim. 2d 52.02 and the earlier version when read in conjunction with other appropriate instructions does not constitute reversible error. Here, when the instructions are read together and as a whole the substance of the State's burden of proof and the duty of the jury was adequately covered. See *State v. Abu-Isba*, 235 Kan. 851, 685 P.2d 856 (1984).

Appellant's other complaint about the instructions is the failure of the court to instruct upon the lesser included offense or lesser offense of unlawful deprivation of property, K.S.A. 21-3705. The statute provides in part:

"Unlawful deprivation of property is obtaining or exerting unauthorized control over property, with intent to deprive the owner of the temporary use thereof, without the owner's consent but not with the intent of depriving the owner permanently of the possession, use or benefit of his property."

K.S.A. 1984 Supp. 21-3107(3) requires the trial court to instruct the jury on lesser crimes of which the accused might be convicted under the information and upon the evidence presented. Keeler maintains unlawful deprivation of property is a lesser included offense or, in the alternative, is a lesser crime pursuant to K.S.A. 1984 Supp. 21-3107(3) and requested the trial court to instruct on unlawful deprivation of property as a lesser included offense. This request was denied. An offense is a lesser included offense under K.S.A. 1984 Supp. 21-3107(2)(d) when all elements necessary to prove the lesser offense are present and required to establish the elements of the greater offense charged. *State v. Coberly*, 233 Kan. 100, 661 P.2d 383 (1983).

In *State v. Burnett*, 4 Kan. App. 2d 412, 607 P.2d 88 (1980), the Court of Appeals held that unlawful deprivation of property is not a lesser included offense of theft. In *Burnett* the court determined that an intent to permanently deprive and an intent to temporarily deprive were distinctly separate elements and not merely differing points on a continuum and, therefore, unlawful deprivation was not a lesser included offense of theft. We think

otherwise. Both statutes have as an element of each offense the requirement of an intent to deprive the owner of the use of his property. In K.S.A. 21-3705 the intent is to deprive temporarily while in K.S.A. 1984 Supp. 21-3701 the intent is to deprive permanently. In *State v. Long*, 234 Kan. 580, 588, 675 P.2d 832 (1984), this court appeared to accept the holding of *Burnett* when it was cited along with several other cases as examples of various crimes which had been held not to be lesser included offenses. In *State v. Andrews*, 218 Kan. 156, 157-58, 542 P.2d 325 (1975), although not an issue directly before the court, we recognized unlawful deprivation of property as a lesser included offense of theft. In *State v. Moore*, 220 Kan. 707, 556 P.2d 409 (1976), the defendant was prosecuted for theft and on appeal asserted it was error for the trial court not to have instructed on unlawful temporary deprivation as a lesser included offense. This court affirmed the trial court not on the basis that temporary depriva-tion of property was not a lesser included offense of theft but for the reason there was no evidence to support an instruction on the lesser crime. In his dissenting opinion in *Burnett*, Judge Abbott (now Chief Judge) states:

"It seems to me that unlawful deprivation of property and theft involve a different degree of intent; *i.e.*, the intent to temporarily deprive versus the intent to permanently deprive. Thus, there is not a different element involved in unlawful deprivation. All of the essential elements are the same. Other jurisdic-tions that have considered whether 'joyriding' is a lesser included offense·of theft, *e.g. State v. O'Brien*, 114 N.H. 233, 317 A.2d 783 (1974), and *Common-wealth v. Nace*, 222 Pa. Super. Ct. 329, 295 A.2d 87 (1972), are in accord with what I believe to be the rule in Kansas." 4 Kan. App. 2d at 419.

We agree it is difficult to discern how an intent to permanently deprive does not include the intent to temporarily deprive and, in the alternative, how an intent to temporarily deprive is not an inherent part of an intent to permanently deprive. We hold that the crime of unlawful deprivation of property under K.S.A. 21-3705 is a lesser included offense of theft under K.S.A. 1984 Supp. 21-3701. The holding to the contrary in *Burnett* is over-ruled and similar language in *Long* is disapproved.

However, our holding on this point does not necessarily man-date reversal in this case. It is well-settled in Kansas that the duty to instruct on lesser crimes arises only when there is evidence upon which a defendant might reasonably be convicted of the lesser crime. *State v. Davis*, 236 Kan. 538, Syl. ¶ 7, 694 P.2d 418

(1985). Keeler took the stand and denied any involvement in the theft of the Sippels' Toyota. The only version of the offense presented at trial was that offered by the State. Nothing is contained in the record to indicate any evidence was produced to show the defendant intended to restore the Toyota to its owner. Under the theories presented at trial Keeler was either guilty of theft or not guilty. *Cf. State v. Royal,* 234 Kan. 218, 670 P.2d 1337 (1983); *State v. Warren,* 221 Kan. 10; and *State v. Winters,* 120 Kan. 166, 241 Pac. 1083 (1926). No error is shown from the trial court's refusal to instruct on unlawful deprivation of property.

Next, appellant asserts the trial court erred when it denied his motions to dismiss based upon the insufficiency of the affidavit filed to secure the warrant for arrest and filed in support of the complaint. It is argued that the affidavit and the evidence at the preliminary hearing were insufficient to establish probable cause that a theft, *i.e.* an intent to permanently deprive, had occurred. We have carefully examined the record and find no merit in appellant's contention.

Finally, appellant asserts error in the court's overruling of his motion at the close of the State's evidence for acquittal or, in the alternative, that the charges be reduced to unlawful deprivation of property. What has been said heretofore adequately shows this issue to be without merit.

In case No. 57,732, the judgment of conviction is affirmed.

We now turn to the appeal of the State of Kansas which is based upon the sentencing of Keeler. At the time of the theft in this case, Keeler was free on a suspended sentence for burglary imposed by Judge Hodge of the Sedgwick County District Court. After conviction herein, sentence in the prior case was imposed by Judge Hodge and Keeler was ordered incarcerated. Thereafter, on August 30, 1984, Judge Kimmel, in this case, sentenced Keeler to imprisonment for a term of one to five years and ordered the sentence to run consecutively to the prior case as required by K.S.A. 1984 Supp. 21-4608(3). See *State v. Ashley,* 236 Kan. 551, 693 P.2d 1168 (1985); *State v. Kerley,* 236 Kan. 863, 696 P.2d 975 (1985). However, the court then went on to order that Keeler be released to the custody of the Sedgwick County Community Corrections Program effective upon completion of the prior sentence imposed by Judge Hodge. The State raises three questions about Judge Kimmel's sentencing orders:

"1. Whether the sentencing court upon committing a defendant to the custody of the Secretary of Corrections has the power to then direct that such defendant be placed pursuant to such commitment in a residential facility supervised by the local community corrections department?

"2. Whether the district court can place a felony offender in a community corrections program absent a grant of probation or suspension of sentence?

"3. Whether the sentencing court erred in failing to order the defendant transported to the custody of the Secretary of Corrections pursuant to his conviction and sentence?"

The first two questions have recently been dealt with at length in *State v. Fowler* 238 Kan. 326, 708 P.2d 539, 1985. In a scholarly opinion, Justice Prager reviewed sentencing procedures and alternatives under our statutes and the court held:

"In a criminal case where a defendant has been convicted of a felony and the trial court desires to commit the defendant, K.S.A. 1984 Supp. 21-4603(2)(a) requires that he be committed to the custody of the Secretary of Corrections. There is no statutory authority for a district court in a felony case to commit the defendant to the custody of a community corrections center." Syl. ¶ 1.

"If a trial court actually imposes a sentence of commitment and desires to place the defendant in a community corrections center, it may do so only by placing the defendant on probation and making confinement in the community corrections center a condition of his probation." Syl.¶ 2.

"If a defendant in a felony case is committed under a sentence, the commitment must be made to the custody of the Secretary of Corrections who may then utilize community corrections facilities by contract in carrying out programs to rehabilitate a convicted felon." Syl. ¶ 3.

In the instant case the journal entry of judgment provides in part:

"IT IS THE SENTENCE OF THIS COURT AND IT IS HEREBY CONSIDERED, ORDERED, ADJUDGED AND DECREED that the *defendant is hereby committed to the custody of the Secretary of Corrections* for imprisonment for a period of not less that one (1) year nor more than five (5) years on the charge of Theft, contrary to K.S.A. 21-3701(a) and in accordance with K.S.A. 21-4501(d). Said sentence shall run consecutive to the sentence imposed in Case No. 83 CR 908 [Judge Hodge's case] and the defendant shall pay the costs of this action to the Clerk of this Court, including witness fees and miscellaneous expenses." (Emphasis added.)

The court then went on to authorize "the Sheriff of Sedgwick County to release the defendant to the care, custody and control of the Sedgwick County Community Corrections Program and its representatives for the purpose of serving the sentence hereby imposed." Having already sentenced Keeler to the custody of the Secretary of Corrections, the court had no power to direct his sentence be served in community corrections absent probation. *State v. Fowler*, 238 Kan. 326. As held in *Fowler*, a district

court may only place a person in a community corrections center as a condition of probation or suspension of sentence. The trial court erred in directing that Keeler be placed in the Sedgwick County Community Corrections Center.

The broader issue raised by the State's appeal is whether a district court, sentencing a defendant under K.S.A. 1984 Supp. 21-4608(3) for a crime committed "while on probation, parole or conditional release," has the power to grant probation in the later crime or whether the defendant must *serve* his consecutive sentence by incarceration. The statute provides:

"Any person who is convicted and sentenced for a crime committed while on probation, parole or conditional release for a felony shall serve the sentence consecutively to the term or terms under which the person was on probation or released."

The State, without citing any relevant authority, contends that the term "serve" as contained in the statute means incarcerate and that the only way the sentence in the later case may be served is by actual imprisonment. The State relies upon the cases of *State v. Johnson*, 6 Kan. App. 2d 750, 634 P.2d 1137, *rev. denied* 230 Kan. 819 (1981), and *Esters v. State*, 1 Kan. App. 2d 503, 571 P.2d 32 (1977), for its argument that "serve" actually means incarceration. The State's reliance on *Johnson* and *Esters* is misplaced. In those two cases the court was dealing with mandatory sentencing under K.S.A. 21-4618 for the use of a firearm during the commission of certain crimes. The present version of that statute provides "Probation or suspension of sentence shall not be granted . . . ." To *serve* a sentence imposed under K.S.A. 21-4618 clearly requires incarceration. The cases cited and the statute they construed are not authority for the proposition that "serve" as used in K.S.A. 1984 Supp. 21-4608 means incarceration. To the contrary, those authorities and the firearm statute make it clear that the legislature can and will, when it so desires, make it abundantly clear when probation is to be absolutely denied. We find nothing in the statutes that mandates that the court (Judge Hodge in this case) revoke probation upon conviction of a felony which occurred while the defendant was on probation. The judge in the later case certainly cannot dictate that earlier probation be revoked. While it would be highly unusual that a judge who had granted probation would not revoke that probation upon commission of the later felony,

circumstances which might justify such action are not inconceivable. In K.S.A. 1984 Supp. 21-4608(6)(e), the statute refers to "the amount of time served on probation, parole or conditional release . . . ." Thus it appears that the legislature has not equated the term "serve" with incarceration and we cannot read such a restricted meaning into the word. If a person can serve his sentence while on probation under one section of the statute, it would seem that the same meaning should be applied to the same word in another section of the statute. We hold that K.S.A. 1984 Supp. 21-4608(3) does not preclude the granting of probation under appropriate circumstances, however remote such a possibility might be.

Unfortunately this does not finally dispose of the case before us. Judge Kimmel, in his colloquy with counsel, is unclear as to what he did intend. He appears to have intended commitment to the Secretary of Corrections and no probation. He states:

"But, this brings up the old problem that I'll refer to as the 'Sanborn question' and that is: Are people put on probation when they go to Community Corrections, his theory being no, resoundingly so. As a matter of fact, I feel that they are committed to Community Corrections and that this is not probation."

He then goes on to talk about probation to Community Corrections but the journal entry signed by the judge quite clearly states that Keeler was "committed to the custody of the Secretary of Corrections for imprisonment" and no mention of probation, as such, appears therein. We conclude that the sentence imposed was improper and that the case must be remanded for resentencing.

The conviction in case No. 57,732, the appeal of Louis Keeler, Jr., is affirmed. Case No. 57,789, the appeal of the State, is reversed and the case is remanded for resentencing in accordance with the statutes and the views expressed herein.