NOT DESIGNATED FOR PUBLICATION

No. 119,063

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ROBERT L. BROWN JR.,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed December 21, 2018. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, for appellant, and *Robert L. Brown Jr.*, appellant pro se.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before POWELL, P.J., ATCHESON and GARDNER, JJ.


PER CURIAM: Robert L. Brown Jr. appeals from the district court's summary denial of his lengthy, pro se K.S.A. 60-1507 motion which raised multiple issues. Brown asks us to remand his motion to the district court for an evidentiary hearing on his claims of ineffective assistance of trial counsel. Although Brown raises several serious issues, he fails to support his claims with the required evidentiary basis so we affirm.

1

*Factual and procedural background*

Brown was convicted of attempted first-degree murder and aggravated robbery in October 2013. In his direct appeal, Brown argued that the trial prosecutor committed prosecutorial misconduct, the State presented insufficient evidence to convict him of the crimes charged, and the district court abused its discretion by denying his motion for a new trial. This court analyzed each of Brown's arguments based on the following facts, which underlie Brown's current claims of ineffective assistance of counsel:

"The victim in this case, Rochelle Chatfield Andrews (the parties refer to her as Chatfield so we will do the same), is a veteran who served in the Persian Gulf War. In 2012, Chatfield was receiving Veterans Affairs benefits in addition to social security disability payments amounting to approximately $4,000 per month which she apparently converted to cash and kept in her home.

"Between April and June of 2012, Chatfield was looking to buy a home. She retained real estate agent Lou Ann Thoms with Coldwell Banker to assist her and viewed various properties for sale, ultimately deciding to purchase a house located on Granthurst Street, in Topeka, Kansas. While Chatfield had enough cash to cover the $15,000 down payment, she required a home loan to buy the house. Chatfield met with a bank employee concerning her home loan.

"After listening in on Chatfield's conversation with the bank employee, Brown approached Chatfield and introduced himself while she was conducting her business at the bank. He told Chatfield he dealt in real estate and gave Chatfield his card that read 'Real Estate Agent, Coldwell Banker.' Later, as Chatfield left the bank, Brown was waiting for her by her car. He gave Chatfield his phone number. However, Chatfield told Brown she already had a house she was set on buying and left.

"Brown continued to contact Chatfield with respect to viewing and buying other houses. Chatfield, apparently believing Brown was actually a real estate agent with Coldwell Banker, agreed to meet Brown the afternoon of June 15, 2012, to finalize the

2

purchase of the home on Granthurst Street. Brown had told Chatfield that he and Thoms, Chatfield's current real estate agent, had agreed to let Brown handle her home purchase. Chatfield's understanding was that she was going to meet with Brown to close on the Granthurst house that night and was to bring the down payment with her in order to finish the sale.

"Chatfield carried approximately $20,000 in cash that afternoon. She placed $15,000 in her pocket for the down payment, rolled in increments of $5,000. The remainder of the money was in her purse. She also wore jewelry: a diamond cross, a gold cross, a gold necklace, diamond earrings, rings, bracelets, and a watch.

"At Brown's suggestion, Chatfield initially met him at the Elks Club, a restaurant on 14th Street and Madison. Immediately after meeting there, Brown and Chatfield took two separate cars to the house on Granthurst Street. There, Brown was unable to retrieve the key from the exterior lockbox to open the house. Chatfield did not find this suspicious because Thoms had also been unable to retrieve the key on a prior occasion.

"Brown and Chatfield drove back separately to the Elks Club and went inside. Brown ordered dinner and drinks for both of them; Chatfield did not drink any alcohol at dinner. Brown confirmed with Chatfield that she was carrying the cash for the down payment. Although Chatfield had already decided to buy the house on Granthurst Street, Brown convinced Chatfield to come with him to see another house.

"Again driving in two separate cars, Chatfield followed Brown. Unbeknownst to Chatfield, Brown was actually leading her to his own house. On the way, Brown stopped at a liquor store; Chatfield waited in her car. Once they arrived at Brown's house, Chatfield parked on the street and placed her purse in the trunk. She carried $15,000, still separated into three rolls, in her coat pocket. Chatfield observed another man enter the house and, after speaking with Brown for approximately 1 minute, exit out the back door. Chatfield did not see this man again. Following a tour of the house, Chatfield told Brown she was still only interested in buying the house on Granthurst Street. At this time Brown noticed Chatfield was no longer carrying her purse and asked whether Chatfield was still carrying the cash for the down payment; Chatfield answered that she was.

3

"Chatfield and Brown then sat down in the living room. Brown lit a marijuana joint and made drinks for himself and Chatfield. He spilled one of the drinks on her. Brown left the living room after Chatfield declined the marijuana and the drink. Another man, described as short with dark skin, entered the living room and asked Chatfield if she knew where Brown was. Chatfield told him she did not know, and the man exited the house out the back door. Chatfield did not see this man again.

"Brown returned to the living room with two more drinks. Chatfield asked Brown to use the bathroom and told him she was getting ready to leave. Brown asked Chatfield whether she was going to give him the cash for the down payment. Chatfield told him she would give him the money but only after getting the paperwork finalized for the purchase of the home on Granthurst Street. Chatfield again asked Brown to use the restroom.

"The bathroom was located on the second floor of the house. As Chatfield began climbing the stairs, Brown stood beside her to her left and handed her some paper towels. Immediately after taking the paper towels, Chatfield felt something hit her in the back of her head. She fell backwards, and Brown immediately got on top of her and attacked her. Brown repeatedly punched Chatfield in her face and chest until she lost consciousness.

"Chatfield regained consciousness some time later and discovered she no longer had her jewelry or the $15,000 she had brought into the house. Chatfield's shirt was pulled up and her pants were pulled down. Then she heard Brown say, 'I thought I killed you, bitch.' Chatfield looked up and saw Brown over her holding a gun pointed to her head. Chatfield pushed the gun away and stood up.

"Chatfield begin moving toward the front exit of the house, and as she reached the front door, Chatfield looked over her right shoulder and saw Brown behind her with a long-barreled shotgun pointed toward her. After Chatfield again looked back at Brown, Brown shot her in the face. At trial, Chatfield described that '[her] whole face collapsed,' and that '[i]t just blew [her] face off.'

"Despite the gunshot wound, Chatfield managed to exit the house and made it down the driveway to her car. Sara Herrin, a neighbor, was apparently alerted by the sound of gunfire and observed Chatfield through the window of her own house; she

4

testified that Chatfield fell to the ground on Brown's driveway and scooted herself toward her car. Herrin observed Chatfield's car drive away.

"Denise Bartlett was driving her taxi when she watched Chatfield's car speed on 37th Street, slow down, and come to a complete stop. Bartlett was able to observe Chatfield in the car; at trial, she testified that Chatfield 'looked very injured from her nose down.' Bartlett dialed 911 from her cell phone. Angelina Young was leaving the Sonic on 37th and Topeka Boulevard between 9:30 and 10 p.m. when she encountered Bartlett and Chatfield. Young opened Chatfield's car door and observed a lot of blood. Young also dialed 911. The dispatcher asked Young how many times Chatfield had been shot; Young relayed the question to Chatfield, who held up two fingers in response. Young applied pressure to Chatfield's face with a towel until the ambulance arrived. Chatfield remembered talking to Bartlett and Young and testified that she explained to them that Brown had shot her.

"Officer Sara Sieve was dispatched to 3721 South Topeka Boulevard in reference to the shooting. She arrived on the scene at 9:57 p.m. Chatfield had already been placed in the ambulance, and Sieve, immediately after arriving on the scene, entered the ambulance to ride with Chatfield. Because Chatfield was unable to speak, Sieve handed Chatfield a notepad and asked her to write down what happened. In reference to who shot her, Chatfield wrote the name 'Robert.' Chatfield also indicated to Sieve that the person who shot her was African-American. Finally, Chatfield conveyed that the contact information of the person who shot her was in the center console of her car. Sieve relayed this information back to the officers at the scene. Sieve eventually got a clear look at Chatfield's injury and described that '[h]er whole lower face was completely gone.'

"Back at Chatfield's car, the officers located a business card in the center console containing Brown's name and phone number. Using the phone number, the officers obtained Brown's address through dispatch. Within 30 minutes the officers set up a perimeter around Brown's house that prevented anyone from entering or leaving the property unseen. The officers observed what appeared to be a shotgun blast through Brown's front door, shattered glass on Brown's front door, and blood on the front steps and driveway. There were also facial tissue and bone fragments on the front porch and front door.

5

"Sergeant Ron Ekis approached the front door of the house and knocked. No lights were on in the house, and no one answered the door. Two hours later, Brown exited the house through the front door. Ekis took Brown into custody without incident. The officers searched Brown and found a cell phone and a 12-gauge shotgun shell in one of his pockets.

"Next, the officers obtained and executed a search warrant for Brown's house. The officers did not find Chatfield's cash or jewelry. However, the officers found a black pump shotgun in Brown's bedroom. The shotgun was later swabbed for DNA evidence, yielding inconclusive results with respect to whether Brown was the shooter. The shotgun was not dusted for fingerprints. The officers also found numerous boxes of shotgun shells and ammunition, as well as four spent shotgun shell casings on the floor. There were holes in a lamp shade in the living room caused by a shotgun blast as well as holes in one of the walls in the hallway going upstairs caused by a shotgun blast.

"Officers interviewed Chatfield in the hospital a couple of days later. Chatfield consistently maintained Brown was the one who shot her, Brown was the only other person in the house at the time of the shooting, and she had carried roughly $18,000 with her at Brown's house that night.

"While Brown was in jail, a detective listened to phone calls between Brown and others and learned that a trailer had been moved from Brown's house to another address on Southeast Wisconsin Street following the shooting. The officers identified the trailer and executed a search warrant on June 18. The officers did not find any of Chatfield's belongings or money.

"Brown was charged with one count of attempted murder in the first degree and one count of aggravated robbery; a jury convicted him on both charges. Brown subsequently filed a motion for a new trial, alleging the State had failed to provide all exculpatory evidence and that there had been insufficient evidence to support each conviction. The district court denied Brown's motion and sentenced him to 247 months in prison." *State v. Brown*, No. 111,161, 2015 WL 1782656, at *1-4 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016).

6

A panel of this court rejected each of Brown's claims and affirmed his convictions. 2015 WL 1782656, at *8-10.

In January 2017, Brown filed a 148 page, pro se K.S.A. 60-1507 motion raising multiple issues. The district court summarily denied that motion in a detailed and well-written 27-page decision. Brown timely appeals the summary denial of his K.S.A. 60-1507 motion, asking us to remand his motion to the district court for an evidentiary hearing on his ineffective assistance of counsel claims. For the reasons detailed below, we find remand unnecessary.

*Did the district court err in summarily denying Brown's K.S.A. 60-1507 motion?*

The sole issue on appeal is whether the district court erred in summarily denying Brown's K.S.A. 60-1507 motion. When the district court summarily denies that kind of a motion, we conduct a de novo review to determine whether the motion, files, and records of the case conclusively establish that the movant is not entitled to relief. *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

To be entitled to relief under K.S.A. 60-1507, the movant must establish by a preponderance of the evidence either:  (1) "the judgment was rendered without jurisdiction"; (2) "the sentence imposed was not authorized by law or is otherwise open to collateral attack"; or (3) "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." K.S.A. 60-1507(b); Supreme Court Rule 183(g) (2018 Kan. S. Ct. R. 223).

Brown relied on the third ground for relief in his K.S.A. 60-1507 motion, arguing multiple unconstitutional acts which required a new trial. To avoid the summary denial of a motion brought under K.S.A. 60-1507, a movant bears the burden of establishing entitlement to an evidentiary hearing. To meet this burden, a movant's contentions must

7

be more than conclusory, and either the movant must set forth an evidentiary basis to support those contentions or the basis must be evident from the record. If such a showing is made, the court is required to hold a hearing unless the motion is a "'second'" or "'successive'" motion seeking similar relief. *Sola-Morales*, 300 Kan. at 881 (quoting *Holt v. State*, 290 Kan. 491, 495, 232 P.3d 848 [2010]).

All of Brown's arguments on appeal allege ineffective assistance of counsel. To prevail on that claim, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales*, 300 Kan. at 882 (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

We address Brown's four arguments separately below.

1. *Denial of the right to testify*

In his original K.S.A. 6-1507 motion, Brown argued that his trial counsel, Mark L. Bennett Jr., was ineffective because he denied Brown his constitutional right to testify on his own behalf. Brown now argues that the district court could not conclusively determine that he was not entitled to relief from the available records and pleadings so it was required to hold an evidentiary hearing. We find, however, that Brown has failed to set forth an evidentiary basis for this claim.

The district court held that Brown's allegation that his trial attorney had refused to allow him to testify at trial failed under the first prong of the *Strickland* test—nothing suggested that his trial counsel was unreasonable in not encouraging Brown to testify at trial.

Our Supreme Court and a panel of this court have emphasized that "'[u]nder K.S.A. 60-1507, a district court *must* conduct an evidentiary hearing unless the motion, files, and records of the case conclusively show that the [movant] is not entitled to relief.' *Bellamy v. State*, 285 Kan. 346, Syl. ¶ 6, 172 P.3d 10 (2007)." *Overton v. State*, No. 99,007, 2009 WL 743175, at *8 (Kan. App. 2009) (unpublished opinion). In *Overton*, the defendant made the same argument Brown makes here and supported his argument with an allegation made under oath that "he told his trial counsel that he was innocent and wanted to take the stand and testify on his own behalf. He claimed his trial counsel assured him he would testify." 2009 WL 743175, at *7. The defendant in *Overton* also suggested that because the jury acquitted him on some charges, his testimony could have persuaded it to find him innocent on all charges. After reviewing pertinent precedent regarding K.S.A. 60-1507 motions and the requirement of evidentiary hearings, this court reversed and remanded Overton's claim for an evidentiary hearing on whether he was denied his right to testify. 2009 WL 743175, at *8.

Brown's case, however, is different because Brown fails to provide even a minimal amount of evidentiary support for his claim. Brown's motion claims only that Brown adamantly stated that he wanted to testify but trial counsel did not "encourage[] or support" his wishes, and repeatedly stated that 90-95% of his clients never took the stand. This shows Brown's desire to testify but fails to provide evidence that Brown's trial counsel somehow precluded him from testifying.

Brown claims that he provided an evidentiary basis for this claim in "his written July 9, 2012 interview notes," yet he fails to cite the record on appeal. Pursuant to

9

Supreme Court Rule 6.02(a)(4) (2018 Kan. S. Ct. R. 34), we may presume that a factual contention is not supported by the record if the appellant fails to cite to the record. Such is the case here. Nonetheless, we have searched the record and have found a document titled "Robert Brown Interview, July 9, 2012." Those notes outline Brown's version of the events on June 15, 2012, but they do not support Brown's assertion that he told counsel he intended to testify or that his trial counsel prevented him from so doing. Those are both necessary here to warrant an evidentiary hearing on this issue.

It is true that we liberally construe pro se pleadings, but mere conclusions are insufficient:

> "[A] pro se movant still bears the burden to allege facts sufficient to warrant a hearing on the motion, and 'mere conclusions of the defendant or movant are not sufficient to raise a substantial issue of fact when no factual basis is alleged or appears from the record.' *State v. Jackson*, 255 Kan. 455, 463, 874 P.2d 1138 (1994)." *Mundy v. State*, 307 Kan. 280, 304, 408 P.3d 965 (2018).

This claim did not merit an evidentiary hearing because Brown failed to provide an evidentiary basis to support it and no such basis appears in the record. See *Swenson v. State*, 284 Kan. 931, 938, 169 P.3d 298 (2007).

2. *Failure to argue self-defense*

In a related claim, Brown asserts that his trial counsel was ineffective because he did not argue the theory of self-defense at trial. Instead, trial counsel's theory of defense was that someone other than Brown had committed the crimes. Brown concedes that use of a different defense was a strategic decision but argues that this decision usurped his right to testify.

10

The type of defense that counsel chooses is a strategic and tactical decision. *Flynn v. State*, 281 Kan. 1154, 1163, 136 P.3d 909 (2006). If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (citing *Strickland*, 466 U.S. at 690-91).

Brown does not show that his trial counsel inadequately investigated this strategic decision, and he solely challenges the strategic decision that Bennett made. Because Brown fails to support his claim that Bennett's strategic decision was somehow deficient or prejudicial, we find no need for an evidentiary hearing.

3.  *Presentation of character witnesses*

Brown argues that his trial counsel was ineffective because he failed to call character witnesses. Whether trial counsel's failure to call character witnesses constitutes deficient representation depends on the facts of each case. Compare *State v. Black*, No. 93,926, 2008 WL 2369789, at *8 (Kan. App. 2008) (unpublished opinion) (finding counsel deficient for not calling character witnesses where case depended solely on credibility of parties and counsel showed no reasonable basis for refusing to submit the testimony of any character witnesses proposed by the defendant), with *State v. Smith*, 16 Kan. App. 2d 478, 482, 825 P.3d 541 (1992) (finding no deficient representation when the character evidence defendant sought to have admitted may not have helped but may actually have harmed him by opening his character to cross-examination).

Here, Brown does not specify what evidence should have been admitted at trial. His reply brief mentions and his motion includes some letters and emails with testimony

11

from character witnesses, but many of those exhibits are dated after the trial concluded. Counsel cannot be faulted for not including those posttrial documents, which were presumably not submitted until sentencing. Brown does not show that he disclosed those exhibits to Bennett or notified Bennett of character witnesses during trial. But even had he done so, Bennett could reasonably have decided not to present them to the jury to avoid opening up Brown's character to the State's cross-examination. That is a strategic decision that has not been shown to be unreasonable here, particularly given Brown's admission that he shot the victim.

Even if not putting on character witnesses could be deemed deficient, Brown has failed to show prejudice. We agree with the district court that it is unreasonable to assume that these witnesses' testimonies as to Brown's character as peaceful, kind, charitable, and hardworking would counteract the "plethora of evidence" mounted against Brown at trial. Brown has failed to establish any reasonable probability that the jury verdict would have been different had it heard the character evidence.

4. *Failure to impeach the victim's testimony*

Brown argues that an evidentiary hearing was required to decide whether trial counsel's decision "not to attack the three pillars of the [S]tate's case . . . was strategic or an oversight." Brown maintains that those three pillars included the following facts that the State sought to prove at trial: (1) The victim was in the process of buying a home with a real estate agent other than Brown, (2) Brown posed as a real estate agent, and (3) Brown convinced the victim to look at a house on the date of the offense. Brown specifically argues that his defense counsel was ineffective by failing to use State's Exhibit 209 to impeach the victim's testimony to combat the State's three pillars.

The State argues that this issue should not be addressed because Brown fails to provide record cites to where Brown raised this issue below and Brown fails to cite the

12

exhibit he relies on. The State then correctly asserts that Brown's failure to designate a record results in the presumption that the action of the district court was proper. See *State v. Kleypas*, 305 Kan. 224, 344-45, 382 P.3d 373 (2016). The State also correctly notes that this court "'will not independently search the record and guess which specific facts [appellant] believes support his general allegations.'" *State v. Kettler*, 299 Kan. 448, 465, 325 P.3d 1075 (2014).

Still, Brown's argument fails even if we excuse Brown's failure to cite the record on appeal. State's Exhibit 209 is the purchase agreement the victim signed with real estate agent Thoms. Brown argues that had trial counsel cross-examined the victim using Exhibit 209, her "testimony would have been discredited regarding all point of any real estate scam." Specifically, Brown claims that the exhibit could have been used to show that Brown was not a party to the contract and that the contract did not require a $15,000 down payment. But as the State points out, no one alleged that the victim had not entered into a contract with Thoms and no one alleged that Brown was a party to that contract. Additionally, it did not matter whether the contract required $500 rather than a $15,000 down payment. The victim testified that she spoke only to her real estate agent, Thoms, about the $15,000 down payment. After overhearing this, Brown told the victim she needed to bring $15,000 to the house on the night of the offense.

State's Exhibit 209 was admitted at trial, and the jury was duty bound to determine the weight of the evidence, the reasonable inferences to be drawn from it, and the credibility of witnesses. See *State v. Hammon*, 245 Kan. 450, 457, 781 P.2d 1063 (1989). Brown has not explained how Bennett could have used this exhibit to have impeached the victim's testimony regarding the down payment or Brown's involvement in the events.

Brown fails to show that Bennett's performance was deficient, much less prejudicial. We find no error in the district court's well-reasoned decision summarily denying Brown's motion.

13

Affirmed.

* * *

ATCHESON, J., concurring:  The Shawnee County District Court properly denied Defendant Robert L. Brown Jr.'s motion for habeas corpus relief without appointing a lawyer for him and dispensing with an evidentiary hearing. Despite the length and detail of the motion Brown drafted, the papers and the record in the underlying criminal prosecution conclusively establish he is entitled to no relief under K.S.A. 60-1507 based on his claim that his trial lawyer provided constitutionally ineffective representation resulting in his convictions for attempted murder and aggravated burglary. I, therefore, concur in the majority's decision to affirm the district court. But I take a different approach in getting to that conclusion as to Brown's assertions that his lawyer should have presented the jury with self-defense evidence and should have called character witnesses during the trial.

As the majority outlines, the State charged Brown with shooting Rochelle Chatfield Andrews and taking jewelry and a large amount of cash from her. The trial evidence indicated at least one other man was in the house where the crimes took place. Brown did not testify in his own defense, and his lawyer suggested the victim may have mistakenly identified him, rather than the other man, as the shooter. The jury discounted that suggestion and convicted Brown. This court affirmed the convictions on direct appeal. *State v. Brown*, No. 111,161, 2015 WL 1782656 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016).

In his 60-1507 motion, Brown says he explained the encounter to his lawyer before trial and described a scenario in which he believed Chatfield was in cahoots with a man he saw outside the house and the pair intended to harm him, so he shot in self-defense. Among the many documents attached to the motion, Brown included a three-page typed narrative statement his lawyer appears to have prepared based on their

14

discussion. In the motion, Brown characterizes the statement as an accurate summary of what he would have told the jury had he testified in his own defense.

The majority concludes Brown should be denied relief on this point because he has presented nothing to suggest his trial lawyer failed to make a reasoned strategic decision to forgo self-defense in favor of an identity defense. But that analysis imposes a quintessential catch-22 on Brown and other defendants seeking habeas corpus relief. The majority says Brown can't get a hearing because he has offered no evidence about his trial lawyer's ostensible strategic decisions. As a practical matter, however, that evidence commonly must be developed in an evidentiary hearing on the 60-1507 motion at which the lawyer produces his or her work file and testifies about why he or she handled the criminal case in a particular manner. See *Johnson v. State*, No. 109,169, 2014 WL 1362929, at *5 (Kan. App. 2014) (unpublished opinion); *Oliver v. State*, No. 106,532, 2013 WL 2395273, at *5 (Kan. App. 2013) (unpublished opinion); *Bowles v. State*, No. 102,689, 2011 WL 2793221, at *2 (Kan. App. 2011) (unpublished opinion). The majority has imposed an artificial (and impermissible) barrier to uphold the denial of Brown's motion without an evidentiary hearing.[1]

[1]In criminal cases, defense lawyers typically need not explain why they represented their clients as they did. If a defendant requests a new trial based on the ineffectiveness of his or her lawyer or asserts ineffectiveness as a point on direct appeal, the district court may—on its own or at the direction of an appellate court—hold what's called a *Van Cleave* hearing to explore the claim. See *State v. Van Cleave*, 239 Kan. 117, Syl. ¶ 2, 716 P.2d 850 (1986). A *Van Cleave* hearing functionally replicates an evidentiary hearing on a 60-1507 motion, except that it is held as part of the direct criminal case rather than in a collateral proceeding. A district court could rely on the evidentiary record from a *Van Cleave* hearing to summarily deny a 60-1507 motion questioning purported strategic decision of the trial lawyer. Usually, however, ineffectiveness claims will be deferred to 60-1507 proceedings, since they become moot if a defendant raises some other issue in the direct criminal case requiring a new trial. So the record in most criminal cases lacks evidence about the defense lawyer's reasons for representing the defendant as he or she did. This is such a case.

To prevail on a 60-1507 motion, a convict must show both that his or her legal representation fell below the objective standard of reasonable competence guaranteed by the right to counsel in the Sixth Amendment to the United States Constitution and that absent the substandard lawyering there probably would have been a different outcome in the criminal case. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014); see *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 3, 4, 694 P.2d 468 (1985) (adopting and stating *Strickland* test for ineffective assistance). Whether the lawyer made reasoned strategic decisions bears on the first component. And courts making a retrospective evaluation of those decisions are to give great deference to studied strategic choices. See *Strickland*, 466 U.S. at 689-90; *Holmes v. State*, 292 Kan. 271, 275, 252 P.3d 573 (2011). Here, the majority effectively finds a constitutionally sufficient strategic decision with no evidence about the lawyer's investigation, evaluation, or conclusions about potential defenses. We have no idea why Brown's lawyer did what he did. Because the district court summarily denied the 60-1507 motion, Brown has not been given the opportunity to develop that evidence. His claim should not be dismissed without a hearing for lack of evidence he could develop only through the hearing.

But the majority's shortchange doesn't necessarily entitle Brown to an evidentiary hearing, let alone relief. To go forward, Brown also has to show how the claimed deficient representation resulted in legal prejudice. Regardless of the quality of his legal representation, Brown's 60-1507 motion fails if it does not establish substantial prejudice. And the district court properly may deny a motion that falters on the prejudice component of the *Strickland* test. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); see *Edgar v. State*, 294 Kan. 828, 843-44, 283 P.3d 152 (2012); *Oliver*, 2013 WL 2395273, at *5.

16

The narrative account Brown has adopted and presented with his 60-1507 motion as the substance of the testimony he would have given as a witness in his own defense at trial fails to establish a factual basis for self-defense under Kansas law. In sum, had Brown testified as outlined in the narrative, the district court would not have instructed the jury on self-defense. In its thorough written decision denying the motion, the district court examined the narrative and provided a well-reasoned explanation as to why the account did not describe any legally recognized ground for self-defense. I do not repeat that exercise here.

Brown's 60-1507 claim based on his trial lawyer's failure to present a self-defense theory to the jury founders on the prejudice component of the *Strickland* test. The district court properly denied the point for that reason.

The majority uses a somewhat similarly misdirected reason to dispatch Brown's claim that his lawyer was ineffective for failing to call character witnesses during the trial. To support his 60-1507 motion on this point, Brown attaches many laudatory letters from friends, business associates, and military personnel who served with him. His lawyer submitted the letters to the district court before sentencing. The letters generally recount favorable associations with Brown, praise his accomplishments and character, and request he be afforded leniency. The majority suggests the letters could not have been used at trial because they were produced later, and Brown's lawyer may not have known about the potential witnesses before trial. The majority also suggests that if Brown's lawyer knew about the letter writers, he presumably made a strategic decision not to call any of them as witnesses during the trial.

Again, we have no evidence about the lawyer's strategic decisions, and Brown has been deprived of the opportunity to develop and present that evidence. So that can't be a sound basis to affirm the summary denial of the claim. And the idea the motion should be denied because the letters were written after the trial rather than before seems to miss the

17

point. The letters would have been inadmissible hearsay if offered at trial. But Brown contends there were people who would have vouched for his good character—as the letters show—and at least some of them would have been effective trial witnesses.

In that respect, however, the letters prove too little, and Brown cannot show prejudice at trial as a result. The letter writers recount favorable experiences or associations with Brown in various settings. In broad terms, the letters, thus, characterize Brown as a capable and decent person. That sort of praise may be of some worth to a district court considering a sentence for a defendant and, in particular, a request for a downward dispositional or durational departure. But those generalized sentiments would not have been admissible character evidence at trial had the letter writers been called as witnesses.

As provided in K.S.A. 60-447, a defendant in a criminal case may call witnesses to offer reputation or opinion evidence as to a specific character trait that would tend to prove his or her innocence. See *State v. Bright*, 218 Kan. 476, 477-79, 543 P.2d 928 (1975). Brown presumably would have wanted to prove a character trait for peaceableness or nonviolence. See 218 Kan. at 478. The letters, however, do not show that the writers could or would have been able to testify to that focused trait in conformity with K.S.A. 60-447. Brown did not include with his 60-1507 motion affidavits from persons who would have been willing to do so at his trial. Accordingly, Brown cannot show prejudice because he hasn't established that there were such witnesses. For that reason, the district court properly rejected the point in Brown's 60-1507 motion based on his lawyer's failure to call character witnesses.